Bruce Smith on behalf of the United States James Fyfe, Federal Defenders on behalf of the Appellant Mr. Mark Hernandez Are you going to start off then Mr. Fyfe? Yes, thank you. May it please the Court, I'd like to reserve one minute of my time for rebuttal. Sure, sure. Your Honors, no one involved in the sentencing in this case, not the defense, not the prosecution, not the district judge, believed that the 10-year sentence imposed on Mr. Hernandez was the just and appropriate punishment here. But the district court felt compelled to impose the sentence based on an erroneous belief that it was obliged to apply a portion of the United States v. Booker. In addition, the conviction here cannot stand because of two serious constitutional errors occurring during the course of the trial. The admission of Mr. Hernandez' silence in the face of a custodial accusatory question. And second, the failure to give a correct, legally supported defense theory on a lesser offense of simple possession. Now, in the time that I have, I'd like to turn to the main trial error, the silence, and then to the safety valve issue. Do you plan to comment on the instruction issue at all? And if you don't, I suggest that you might want to. I certainly can. I'll do both trial issues and then entirely remain. Yeah, we're not going to chain you down to 10 minutes. Okay. Don't worry. Fair enough. We might put leg irons on you before we chain you down. That might be very appropriate by the time we reach the end of this. Okay. Turning first to the silence issue, the district court found that this case was almost exactly the same as Estrada Lucas. The government argues that there was not an error here on the basis of three points. First, that Estrada Lucas was wrongly decided. Second, in any event, that Mr. Hernandez was not in custody at the time of the questioning. And even if he was, the error was harmless. Well, turning to the status of Estrada Lucas. Let me focus right on the last point, because it seems to me that's the most telling. And I'd like you to comment specifically with reference to two things. First, all they got out of him that they were able to use was the silence. The judge drew the line between these two questions. I think that's just what happens sometimes in the midst of trial. Let's accept your premise that the line should have been drawn so the silence shouldn't have come in either. But all they got was silence. So there's not like an affirmative admission of any kind. And second, he's caught with the stuff in his pocket. It seems to me difficult to believe that the silence is what tipped the balance or could have caused the jury to convict, given they got caught with the stuff in his pocket. Your Honor, there's two answers to that. One, there was an inadvertent admission of the second statement as well, but the Court did go back and remedy that. The silence itself was prejudicial because of the fact that of other rulings that the district court made, the defense was relegated to arguing lack of knowledge. And this was precisely the sort of evidence that would devastate a lack of knowledge defense because it would indicate by his silence a sort of adoptive admission that the jury could look on this, is that he did know that the drugs were in his pocket. That's what the defense argued at trial was lack of knowledge. Counsel? Yes, Your Honor. Counsel, could you please elaborate or explain how the argument runs that someone has a lack of knowledge of something in their pocket? What counsel argued at trial, with no other defense theory that was being allowed by the district court, what counsel argued was that the drugs were slipped into Mr. Hernandez's pocket by the driver, who was really responsible for importing the drugs. During the time that they proceeded from primary to secondary. The drugs were in Mr. Hernandez's left front trousers pocket, and so counsel argued that it was a likely possibility that the drugs were slipped into his pocket, unknowns to him, and that's where they were found by Agent Carlos. Okay, well, I understand that argument. I'm more interested in the harmless error argument as to why you would say it's not harmless, despite the drugs being there because the jury used the silence to conclude he wasn't credible about the drugs being slipped in there. Well, Your Honor, the defense originally had a couple of theories at trial. The main attempt was to prove that there was no importation, that there was no intent to distribute. Now, the instructions that the defense asked for that, the district court denied those. The only remaining defense left was lack of knowledge about the drugs, and I think that the silence is probably the most devastating kind of evidence for lack of knowledge. There's a similar situation in the United States versus Foster where the same defense was being raised, lack of knowledge that the person didn't know the drugs were present. And again, the silence, the error was considered devastating to that defense because the silence could be taken as an admission of guilt or as an indication that he knew what was in the package that had been retrieved from his pocket. So the one defense which the district court's other rulings had left for Mr. Hernandez to argue, this is exactly the defense which the silence would address. I would point out one other thing, is that the prosecution, when this came up, the prosecution pointed out. When he was asked what the contents of the bag was, then he said, didn't he say meth? There were two statements made seconds apart. The first statement was made by Agent Carlos, and he asked what's this when he held up the bag that was retrieved from his pocket. Mr. Hernandez said nothing at that point. Then seconds later, another agent standing by at this point said, is it meth? Mr. Hernandez answered yes, but the district court kept that out. That was deemed inadmissible. The problem is that these were only seconds apart. None of the physical circumstances had changed. Yeah, but, you know, you hold something up and he's silent. That can mean a lot of different things. It can mean, God, he's just surprised that it's there. He's just shocked. I just don't think these are really strong arguments. Do you? I would say so on the basis of the case law, Your Honor, yes, because of the fact that silence in the face of an accusatorial custodial questioning has been deemed to be a violation of the Fifth Amendment. This is basic. But this isn't the question. We've conceded for the discussion there's a violation. The question is, could it have had any impact in this trial? And I have to say, you've now heard skepticism from all three of us. It may be time to try the next issue. Okay. Very well, Your Honor. I'll move on to the second trial issue, which is the instructional issue. Let me just focus you on my concern on that. Okay, Your Honor. So that in your argument you can address it. It seems that under the expert testimony there's a minimum of, let's say, 40, is it 49 or 24 doses? Between 48 and 96 doses. Okay, so there's a minimum of 48 doses. Right. So now I suppose just like a squirrel stocks up acorns for the winter, that someone who's a drug user possibly could stock up on a supply. But, you know, what's your best argument with any cases, either within our circuit or outside of our circuit, that a 48-dose amount could be just for personal use? Your Honor, I'm sorry, I can't cite any particular cases that have addressed the issue of whether or what particular number can be served as a personal amount. This is something that was based on the expert's personal opinion and based on his experience, that on the basis of the fact that methamphetamine is normally sold in 1-8th and 1-16th ounce doses, I don't know that that's necessarily it would be the same thing as that that is a particular usage dose is an 8th and a 16th. But this was pretty high quality, wasn't it? It was very high quality, but I would say, Your Honor, that that actually could be used, if the Court had allowed the instruction, to support the defense that this was a bulk buy, precisely because someone who wanted to avoid his exposure, the only time that someone could be caught in a situation like this would be during the purchase or during the transport. Once the drugs are home, they're fairly safe unless there's been a search. So one who wants to reduce his exposure may make a large purchase, go across the border, make one purchase for a long period of time. The purity feeds into that because the expert testified that the purity, that the quality of the drug diminishes over time with shelf life. A bulk buyer may consequently buy a higher purity simply in order to compensate for the possible loss of potency over time. So the fact that it was a high purity, though, to the expert, the expert testified only that that could mean high purity means it was going to be cut for further sale. But I think it could have been argued reasonably, rationally, that it was a bulk buy situation for personal use. And where did the appellant reside? Where did the appellant reside? In Stockton, Your Honor, Northern California. So, again, it was a long trip to make. It could have been argued as a scenario that instead of crossing the border multiple times each time he needed a supply, he would go and get a large amount, large purity, that would be cheaper in the wholesale market in Tijuana, and that would supply, as I said, that you could figure with a weekend usage, twice a weekend, a drug user who would just use it on the weekend, that would be a full year's supply, 48 to 96,000. The minimum value testimony said it was worth at least $2,000? Between $2,000 and $4,000. That's what the expert said. So the minimum, 2,000. Is there anything in the record that would shed light on whether an appellant could have a $2,000 quantity for personal use? Nothing specific in the record, Your Honor. There was no, actually no evidence about Mr. Hernandez's past drug history or drug use. This was just an argument that the defense could have made if it were supported by the lesser included offense instruction. How about the sentencing issue? As far as the sentencing goes, the government argues that 3553F is constitutional, but that's not the question. That's not what Mr. Hernandez is arguing here. He's arguing that after Booker, can the criminal history calculation criterion for safety valve be selectively elevated to mandatory status? And the answer has to be no. Because it is clear, Justice Breyer was very emphatic about this in Booker, that the entire solution to the Sixth Amendment problem with the mandatory guidelines was to treat the guidelines as a whole. In fact, he referred to this as critically important, that Congress would prefer the total invalidation of the guidelines to a piecemeal approach, treating different parts of the guidelines differently, treating aggravating and mitigating circumstances differently, treating certain portions requiring fact-finding differently from those that could be supported by judicial findings. So Justice Breyer indicated that it is important that the entire guidelines be treated as a whole. And that's exactly the problem here. That would mean that every reference, every manifestation, every use of the guidelines is advisory. And it doesn't matter which statute refers to it, whether it's 3553F or 3553F. Kennedy. Okay. Say we agree with you on that. So where do we go? I believe what that means, Your Honor, is that in applying the criterion, the one criterion, which makes reference to the safety, to the sentencing factors and safety valve, 3553F1, that that is advisory, how the court will calculate the criminal history. And that the court can at the court. The court in Booker said that the application of the guidelines would be advisory, but it didn't say that all the other statutory provisions, like a mandatory minimum provision, would be advisory. That's correct, Your Honor. But what is unique about 3553F and 3553F1 is that it expressly incorporates the now advisory guidelines into the criterion, one of the criteria, for applying the safety valve. Congress has decided that in certain cases the mandatory minimum does not have to be imposed. It just so happens that one of the criteria for allowing the safety valve makes critical reference to the criminal history calculation according to the guidelines. Once the guidelines are recognized as being advisory, that can only mean that the court does not have to apply the certain, the particular procedure in the guidelines for calculating criminal history. I don't get the logic of that if Congress has spoken in a statute and said, here's our mandatory minimum and these are the reference points that you have to consider for the safety valve. Why does it matter if they're advisory if Congress has specified them? Well, for instance, there's two references to the guidelines in 3553F. The first one is in the body paragraph of 3553F where it says the court shall impose a guideline sentence. Well, it's obvious now after Booker that that can't be taken literally, that the court shall impose a guideline sentence. So already we already have to interpret that portion of 3553F as being advisory. The court does not have to impose a guideline sentence, even though that's what it says clearly in the statute. Otherwise it would be inconsistent with Booker. The next reference to the guidelines is in subparagraph 3553F1 where it says that the criminal history categories shall be calculated according to the guidelines. Again, not to view, since it seems fairly obvious that the first reference, the shall, can no longer be read as shall, that the interpretation of the guidelines is advisory in the body part of 3553F. If it was treated any different in subparagraph 1, it would be a major violation of the usual canons of construction that all uses of a term within a statute are to be treated consistently and to be read the same. But the word shall was used consistently. The problem is that the Court said in Booker that the first shall violates the Sixth Amendment. It doesn't say that every shall violates the Sixth Amendment or that if you have to reinterpret the first to make it viable, that everything else goes with it. I mean, there's a reason for treating those two sections separately. I agree, Judge Clifton, and if I went any further with that, I would be back to arguing what was argued in the Barrero case in the Second Circuit, that 3553F violates the Sixth Amendment. I'm not making that argument. I'm saying what the problem is, is that Booker made a decision that all the guidelines have to be treated the same, all the guidelines have to be treated advisory. There's no difference from one chapter to another of the guidelines. Everything is advisory. It just so happens that here is a statutory reference, an incorporation of a portion of the guidelines. That has to be consistently treated everywhere in Federal sentencing law. It has to be treated as advisory. Otherwise, you would be going against what Justice Breyer said was critically important that the guidelines be treated uniformly, that to maintain the greatest part of congressional intent, it was necessary to treat the guidelines the same in every use. And the fact that Booker did not have 3553F before it, it's not surprising that there is some consequences that weren't considered by the Supreme Court at the time that Booker was decided. This Court, like in many of the other, as we recently saw in the en banc decision in Zavala and Carty, there were a number of questions that Booker left unanswered that the courts of appeals have to resolve. I believe this is just one more. It was not an intended. But just like the Supreme Court, its decision in Brown v. Board of Education, they may not have foreseen the necessity of addressing redistricting, forced busing, employment contracts. We know all that. But what about what was called Judge Gonzalez's attention at sentencing? As far as qualifying for the safety valve? Yeah, as far as what you're saying. He qualified in every regard under 3553F, except that the government objected that he had not debriefed as required. But he did make that offer at the sentencing, indicating that if the judge were going to go forward, he would conduct the debriefing as required. And the fact that the judge did apply minor role and acceptance of responsibility adjustments shows that it's very likely, of course, that Mr. Hernandez would have participated and given fully all the information necessary to qualify. The one stopping point was the guidelines calculation. As the Court pointed out, he had two criminal history points, even though the judge placed him, departed downward, placed him in Category 1. And I would say that's another argument why he should have qualified for safety valve, because under 3553A6, all defendants who have the same criminal history must be treated alike. Otherwise, there's a disparity. And I would... Why don't we hear from the government? Okay, thank you, Your Honor. Good morning. I'm Bruce Smith, and I'm appearing on behalf of the government. If I could just respond quickly to what Counsel just said a moment ago. I believe the defendant had four criminal history points, and the government unilaterally, without any type of agreement with the defendant, we moved for a downward departure in his criminal history Category 201, given the types of convictions he had. But still, he had four points. And the requirement with the guidelines, and more importantly with the minimum mandatory, is once you're faced with a minimum mandatory, which is what the jury found, there's only two ways out from under that. And one is safety valve, which didn't come into play in this case. And the other is 5K, is by cooperation. The safety valve, he had four points, and he didn't meet with the government. And meeting with the government, perhaps he could have resolved. But the four points, there was just nothing that could be done about it. And defense counsel did not object that there were four points. Defense counsel acknowledged it. The district court acknowledged it. We gave the government agreed to extra time for defense to see what they could do to dissolve those four points. But there was nothing that could be done. And so we're faced with the sentencing paradigm that tells us that when you're faced with a minimum mandatory, like I say, there's only two ways out from under that. And we gave him every opportunity, and he just couldn't qualify. So, anyway, if the court has any questions. Had there been no guidelines ever, they still would have had the minimum mandatory. Yes, sir. Unless someone installed or built. Okay. Another way out from under that. Yes, sir. You know, I don't have any questions on the safety valve. But I do have questions about the lesser included offense instruction. Why a simple possession instruction could not be consistent with a person, you know, having a month's supply or so of methamphetamine in their possession. Yes, sir. Our response to that was the same thing as it was in trial. It was the same thing that confronted Judge Gonzales. There was no evidence of that. The defense didn't put on an expert. They didn't put on someone who knew the defendant. They didn't put on someone to enlighten the jury about facts present that would indicate that such a thing was going on. What we had was a defendant with a quantity of methamphetamine the size of a man's hand, which when we look at these marijuana cases, it might not sound like so much, but this is a very concentrated chemical. The chemical is designed, when it's in this high potency condition, to be diluted, broken down, and then sold, as the expert said, 20 to 50 percent purity, sold in amounts of close to a gram. So we have what may not fill the courtroom, but we have quite a bit of drugs worth quite a bit of money. But that's all we had. I'm not saying it's probable one way or the other, but in terms of the jury's function, why wouldn't it be within the jury's province to decide if, you know, if this person could have had that quantity that you're describing just for personal use? Because, Your Honor. I understand if it was a truck with $10 million worth of marijuana or methamphetamine, there'd be no question. It couldn't be for personal use. It would have to be for distribution. But what is it that suggests that 48 doses or $2,000 worth can't be for personal use? Your Honor, what suggests that is the evidence at trial, that we put on our evidence of the quantity, the purity, the potency, the weight, the dollar value, how it's normally consumed, and the defendant put on nothing. They offered nothing. So as defense counsel said, I know this is only argument, Your Honor. That was what she said. And that's to answer Your Honor's question, and not to interrupt, but to answer Your Honor's question, why shouldn't it be presented to the jury? Because you're just offering something up that isn't necessarily, isn't at all supported by the evidence with the hope that maybe a juror will accept it. But no evidence. There has to be evidence to support it. Well, there is evidence. Let me go back to your expert. Go ahead, sir. Did the government expert, in specifying the dosage amount and the value, did the government expert give expert testimony that this size could not be for personal use? He said it was definitely for distribution. I don't recall, no one asked him, is it possible that it could have been possessed for personal use? I don't know if anyone asked him that question. But he certainly, his, the testimony I recall, and that which is, I've read in the transcript, in his final line on direct was this was definitely for distribution. Thank you. The calculation of quantity translating into a number of doses, the range given by defendant was 48 to 96, I believe. Was that something that the expert testified to, or is that a subsequent calculation? No, sir. That's what the expert testified to. He talked about how methamphetamine, this potency, is broken down for street consumption. He told us that it goes, in this case, from a 70% purity down to a 20 to 50%. And then asked, well, how is it normally sold? What quantity is it normally sold on the streets? And he talked about what they call an eight ball, which is 3.5 grams, of course, 28 grams to the ounce. An eight ball is 3.5 grams, or a teener is 1.78 grams. So you hear about very small amounts of this methamphetamine diluted is the type you expect the end consumer to possess, not some great block of potent methamphetamine worth thousands of dollars where there's no indication that he could rub two nickels together. Well, see, what concerns me here is that I go to Costco, and I see people wheeling out toilet paper that seems like a year's supply, and I wonder what they're going to do with it. Well, if you're going to buy things in quantity, sometimes you save a lot of money. And I don't know that it's beyond the realm of possibility or that any more evidence has to be submitted than you've got a quantity that may translate into this calculated 48 to 96 doses. Well, this would be, you know, if you're a scotch drinker. This is coming home with a hog's head of cask-strength scotch. It's a huge amount. It's too potent, really, to use in its present condition. And the dilution and the process issue would go through. And, again, there was we're speculating. That's what defense counsel wants to do. Well, just let the jury guess. I respectfully submit there has to be some sort of evidence forward. There is. The evidence is the quantity. And if, in fact, the quantity does translate into as little as 48 doses, I suggest that's something you're allowed to argue about. It's not like he's saying there's a Brinks truck filled with stuff, but maybe there wasn't any good drugs in there, so we shouldn't. We've got the quantity specified. And from that, isn't it just argument? It's 48 doses, perhaps, at that strength. If you would dilute it down to the strength that the expert said, you're going to triple that or at least double it. But, again, no. I'm sorry. No, that's all right. Is there anything in the record that would tell us whether a user of methamphetamine could take the dose in the purity of this drug the way it was found, as opposed to having to necessarily dilute it to use it? And if it has to be diluted, is that something a normal person can do or is it a laboratory process? That was not offered at trial. And, again, that's a good example of where the defense did not explore and probe those issues. They just let the expert testify without those kinds of questions, like Your Honor's last question. Is it possible my client possessed this for personal consumption? Could my client have ingested or consumed this methamphetamine at the full 70% purity? Those inquiries weren't made. And so what we have is the record, and the record is this is absolutely for distribution. How about extra circuit precedent? Is there any extra circuit precedent covering a quantity like this? Not that I know of, but I didn't specifically look for that, though. I'm sorry. Yes, sir. He resided in Stockton? Yes, sir. That was the testimony. Was his home searched? No, sir. So didn't uncover any laboratory or scales or anything that would indicate that he had the capacity to cut this stuff The only evidence that came in was evidence that came out of that Honda hybrid automobile. That's as far as it went. You know, there's a case. As a matter of fact, that was on the panel a couple years ago. It was a Judge Trott opinion. He says, The defendant is charged with possession with intent to distribute. The district court may refuse to give an instruction on simple possession where there is a large quantity of the drug and other evidence tending to establish distribution. The evidence at trial showed that a search of Vandering's residence This is the guy's name revealed not only 167 grams of methamphetamine but also a methamphetamine lab complete with precursor chemicals, glassware, scales. Furthermore, there was testimony that Vandering's residence  And significantly, Macmillan failed to produce any evidence other than the quantity of methamphetamine actually recovered to support the proposition that the methamphetamine lab was used to produce methamphetamine solely for the personal use of members of the conspiracy. So here, the simple possession instruction was not given. But there was other evidence tending to establish distribution. Did you know about this case? Yes, sir. I believe. If I didn't cite that in my brief, I know I read it and I have it over here. No, I have that case, sir. You have it? Yes, sir, I do. You have it? Does the defense counsel have that? It's correct, Your Honor. I actually referred to it in the filing. Yeah, you got it. All right. Fine. Anything further? Doesn't that answer your question? What else is there here to indicate that there was distribution? What other evidence other than the quantity of the drug? Well, Your Honor, the quantity, the purity, the way it was held, the surrounding circumstances as testified by the expert, and then no evidence, no indication that it was used or held for anything else other than distribution. But here the other evidence was all, you know, the lab and the precursor chemicals, the glassware, the scales and all that. We don't have anything like that here. No, sir, but I respectfully submit that one doesn't need to have to be involved in the synthesis of methamphetamine to possess with the intent to distribute. I mean, those are certainly helpful under those circumstances when you have that kind of a case. But I'd respectfully submit here we have a person who's buying it for resale and distribution, and he's not involved in synthesis. That's the problem. I mean, you're saying if we knew he was buying it for resale and distribution, that ends the question. But we know that based principally upon the volume. I mean, I look at the expert's testimony, and it seems to me his conclusion that this is definitely for distribution comes squarely from the volume. And if defendant can argue, well, this volume, this quantity actually might produce a Costco buyer of meth, what else do we have that tells us it's not – it's improbable, but it's not beyond reasonable doubt perhaps that it's somebody who is going to use it for sale? You know, in many ways it's a Southern California district situation. We have this in many of our cases. We have what we call our border bus cases, which this is one. We have vehicles or persons coming through the ports of entry, and we just have people passing through. And many, many of the people we catch with quantities of drugs are moving them to deliver them or distribute them somewhere else. And the way we make the decision and the way the juries make the decision and the way this Court sustains the convictions every single day has to do with quantity, perhaps purity, the way it's held and the surrounding circumstances. Judge Pregerson mentions another case where they could go into the home and the person was involved in synthesis. Yeah, that's a – it's better if you have that. But down where we are at the port, we have these snapshots of people coming through. Oftentimes we don't know where they've been. We're not certain where they're going. We just know they have a large commercial quantity of drugs with them. But why not give that mere possession instruction? Because if you have a case – I mean, there you are. And then you've got your argument, and then you can make your argument. They can make their argument. Let the jury decide. Your Honor, in this case, it may be – that may be the best thing to do in all cases, to just be absolutely sure. But I – but this case, Your Honor, I respectfully submit there is absolutely no harm done. The court – the district court made the right decision because the district court was faced with no evidence indicating that. If someone is trying to prove that or they're offering evidence or pointing to evidence where that's the case, that's one thing. Then it's a fair decision for the jury to make. But there was nothing, nothing in the record that indicated that. Okay. Okay? Thanks. Thank you all very much. I appreciate your time, sir. We'll give you a minute for rebuttal. Thank you, Your Honors. I just wanted to stress that one point, that Powell, the case cited in the opening brief, and Bobadilla-Lopez, also cited by the defense, but also every single case cited by the government, every one of those cases where they rejected a simple possession LIO instruction involves some other evidence in addition to quantity. Invariably, the case law involves some other element besides quantity. Well, let me just ask you about that because that may be the state of Powell and Vanderleg or those two cases. But surely if quantity was large enough, putting aside this case is large enough, but if someone had $100,000 worth of drug in their car or a million dollars worth of drug in their car, you wouldn't need to have evidence of a scale being found or a bag to say it was for distribution. I agree with you, Your Honor. So you would agree that at some level quantity alone is evidence of intent to distribute? I believe that it is conceivable that the quantity could be so large that there is no possibility that even a Costco buyer could view this as a reasonable amount. But, Your Honor, just to compare it to the actual cases that this Court has decided in Powell, that involved 11 pounds of cocaine. Bobadilla-Lopez involved three large garbage bags full of individually wrapped bricks of marijuana. We're talking about here a piece, a single package that weighs six ounces, as I indicated that that's about three candy bars worth, stuffed in a person's pocket. I think the quantity was pretty similar to the quantity in the case that Judge Fragerson mentioned where he sat with Judge Trott, isn't it? About 170 grams? I can't, I can't, I don't recall a specific fact about Vandering, but I know that the amount can depend. And the only difference is that because of the fact that methamphetamine is indeed a drug that is not like marijuana, that is more valuable in smaller quantities. But that doesn't, the facts here were not inconsistent with a personal use if you consider a bulk buy situation. How come when you argued you didn't push Vandering? Well, Your Honor, this case is, all of the cases, I mean that just falls into the same category with all the Ninth Circuit case law, that there's always something else in addition to the pure amount or value to indicate that it is impossible. Well, you know, you've got Judge Trott's opinion, I joined it, Judge Fitzgerald did, but there was more there, more than the large quantity. There was all this other stuff. In fact, Your Honor, on page 11 of my reply brief, I quoted from Vandering saying that our decision is based on the amount of methamphetamine recovered combined with the considerable amount of other evidence establishing discrimination. When you got up here today and you made your impassioned speech, you didn't bring it up. That's correct, Your Honor. It shows you maybe you don't think it's too important. Well, I think it is an important case, especially now that Your Honor has pointed out that you were involved in the decision. But I think that there's, it's just a pattern. It's one of a number of cases where it's a consistent pattern in the factual basis. Well, I probably concurred because of this other factor. One other thing I would want to point out as far as raising the reasonable doubt of the fact that counsel made about that there was no positive evidence. There was positive evidence in the record that could go to showing that this was a personal use. But I would point out that in any case, the whole point behind giving a lesser-included offense instruction is to avoid the jury making a precipitated decision when it believes that there was not, believes there is reasonable doubt as to the larger offense, but then isn't forced to convict on that larger offense simply because its only other alternative is a full acquittal. The whole point of giving the lesser-included offense is to give the jury a reasonable third alternative. And I think this is exactly the situation here. It wasn't an all or nothing. He was either a distributor or he was totally innocent. It could be quite different. Counsel, you said there was other, there was positive evidence in the record that would support personal use. What was there other than the government expert's testimony of dosage? The testimony that came out, again, because the defense did not bring any witnesses themselves, this is all based on the cross-examination and direct evidence. The evidence showed that there was no equipment, as Judge Fragerson pointed out, associated with distribution that would indicate distribution. The unsophisticated way that the drug was handled, it was just wrapped in cellophane, stuffed in a pants pocket, it was not concealed in the vehicle anywhere. It was not subdivided, as in Boba Dia Lopez, into smaller amounts that could be distributed. There were no customer lists. There were no large amounts of cash, as was found in Powell. There was nothing to associate this drug with a distribution scenario, simply the amount. Thank you. All right. Thank you.  Thank you, Your Honor.
judges: Pregerson, Gould, Clifton